**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ASTRAZENECA AB, ASTRAZENECA LP, and ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiffs,*

v.

DR. REDDY'S LABORATORIES, INC.,

*Defendant.*

Case No. 1:15-cv-00988-SLR

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**MCCARTER & ENGLISH, LLP**
Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
Benjamin A. Smyth (#5528)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com
bsmyth@mccarter.com

**KELLY IP, L.L.P.**
David M. Kelly (Of Counsel)
Robert D. Litowitz (Of Counsel)
Jane W. Wise (Of Counsel)
1919 M Street, NW, Suite 610
Washington, D.C. 20036
Telephone: (202) 808-3570
david.kelly@kelly-ip.com
robert.litowitz@kelly-ip.com
jane.wise@kelly-ip.com

*Attorneys for Plaintiffs*

*Dated: November2, 2015*

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. THE 2011 PATENT SETTLEMENT AGREEMENT BETWEEN THE PARTIES DOES NOT PRECLUDE THE RELIEF SOUGHT BY AZ ..... 1

A. DRL's Absurd Interpretation of the 2011 Agreement Without Regard to the Purpose of that Agreement Violates Well-Settled Principles of Contract Interpretation ..... 2

B. AZ Did Not Release Any Trademark Claims under Section 3.1 of the 2011 Agreement 3

C. Section 9.13 Supports AZ's Position, Not DRL's Position ..... 5

III. DRL'S PAST USE OF A VERY DIFFERENT SHADE OF PURPLE FOR HALF OF ITS OMEPRAZOLE PILLS DOES NOT EXCUSE ITS USE OF AN ALL-PURPLE PILL FOR ITS ESOMEPRAZOLE MAGNESIUM PILLS ..... 7

IV. AZ'S TRADEMARK REGISTRATIONS BROADLY COVER ALL SHADES OF PURPLE ..... 10

V. CONCLUSION ..... 10



ME1 21412305v.1

# TABLE OF AUTHORITIES

## Cases

*Biocraft Labs., Inc. v. Merck & Co.*, 532 F. Supp. 1068, 1078 (D.N.J. 1980) .............................. 3

*Continental Casualty Co. v. Ocean Accident and Guarantee Corp.*, 58 Del. (8 Storey) 338, 209 A.2d 743, 751 (1965) .............................. 2

*DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) .............................. 6

*E.I. du Pont de Nemours v. Shell Oil Co., Del.Supr.*, 498 A.2d 1108, 1113 (1985) .............................. 2

*In re Westech Capital Corp.*, 2014 WL 2211612, at *16 (Del. Ch. May 29, 2014) .............................. 3

*Klair v. Reese*, 531 A.2d at 223; see also *Empire of America*, 551 A.2d at 435 .............................. 2

*New Colt Holding Corp. v. RJG Holdings of Florida, Inc.*, 312 F. Supp. 2d 195, 231-32 (D. Conn. 2004) .............................. 4

*Phunware, Inc. v. Excelmind Grp. Ltd.*, 2015 WL 4606668, at *8, n.13 (D. Del. July 30, 2015) . 6

*Playtex FP, Inc. v. Columbia Cas. Co.,* 622 A.2d 1074, 1076 (Del. Super. 1992) .............................. 2

*Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc.,* 511 F. Supp. 2d 482, 509 (E.D. Pa. 2007) 9

## Statutes

**15 U.S.C. § 1114(1)(a)**: .............................. 5

**15 U.S.C. § 1125(c)(1)** .............................. 5

**15 U.S.C. § 1127** .............................. 5

## Treatises

6 McCarthy on Trademarks and Unfair Competition § 31:20 (4th ed.). .............................. 9

## I. INTRODUCTION

Plaintiffs AstraZeneca AB, AstraZeneca LP, and AstraZeneca Pharmaceuticals LP (collectively "AZ") submit this Reply Brief in Support of its Motions for Temporary Restraining Order and Preliminary Injunction.

## II. THE 2011 PATENT SETTLEMENT AGREEMENT BETWEEN THE PARTIES DOES NOT PRECLUDE THE RELIEF SOUGHT BY AZ

The 2011 Settlement Agreement ("2011 Agreement") between AZ and DRL neither permits DRL's infringement and dilution of AZ's Purple Marks nor prevents AZ from enjoining such acts. DRL complains that AZ "completely fails to tell the Court that five years ago it released DRL from any liability, and covenanted not to sue DRL, for selling a purple generic form of the Nexium product." (D.I. 16 at 1.) In doing so, DRL wants this Court to believe that the 2011 Agreement expressly allowed DRL to use AZ's Purple Marks with impunity. Nothing could be further from the truth. The reality is that the 2011 Agreement settled an ANDA patent infringement case filed in 2008 asserting only patent claims, and the case was settled by AZ granting DRL a patent license under AZ's patents, but not a trademark license to use AZ's trademarks. DRL's suggestion that AZ gave DRL the unfettered right to sell purple generic esomeprazole magnesium capsules in direct competition with AZ is absurd.[1]

[1] As demonstrated below, DRL's contract claims have no merit legally or factually. It is also worth noting that DRL's reference to a few documents from DRL's ANDA must be viewed in the context that DRL's ANDA filing consists of thousands of pages produced during years of litigation and that the ANDA documents were produced as highly confidential documents with limited access to AZ's in-house counsel. More importantly, AZ's in-house counsel's review of any ANDA documents was understandably focused on the patent infringement issues then being litigated, not the color of DRL's anticipated capsules. (Heifetz Decl., ¶ 5.) During the course of negotiations between AZ's in-house counsel and DRL's representative, DRL never conveyed that it intended to market a purple capsule. (*Id*. ¶ 6.) It is also relevant that the bottle of DRL pills referenced in DRL's opposition, pursuant to standard practice, was delivered by DRL's counsel to AZ's outside litigation counsel who in turn sent the pills unopened (to preserve the

### A. DRL's Absurd Interpretation of the 2011 Agreement Without Regard to the Purpose of that Agreement Violates Well-Settled Principles of Contract Interpretation

DRL's twisted interpretation of the 2011 Agreement runs contrary to fundamental rules of contract construction, namely, that an agreement must be construed as a whole giving effect to all provisions, and that meanings arising from a particular provision of an agreement cannot control the meaning of the entire agreement where it runs counter to the agreement's "overall scheme or plan." These principles were articulated in *Playtex FP, Inc. v. Columbia Cas. Co.,* 622 A.2d 1074, 1076 (Del. Super. 1992):

> The basic rule of contract construction gives priority to the intention of the parties. In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan. *E.I. du Pont de Nemours v. Shell Oil Co., Del.Supr.*, 498 A.2d 1108, 1113 (1985) (citations omitted). The court should consider the overall purpose of the contracts and of the specific provisions at issue. *Continental Casualty Co. v. Ocean Accident and Guarantee Corp.*, 58 Del. (8 Storey) 338, 209 A.2d 743, 751 (1965). An understanding of the industry is also important to an intelligent interpretation of the meaning of a contract. [T]he meaning of words used in an agreement can only be known through an appreciation of the context and circumstances in which they were used. *Klair v. Reese*, 531 A.2d at 223; see also *Empire of America*, 551 A.2d at 435.

Here, the 2011 Agreement documents the settlement of an ANDA patent litigation. The case involved only patent claims and no trademark claims. The case was settled by AZ granting DRL a patent license to make and sell certain pharmaceutical products under certain of AZ's patents, but no trademark license. DRL's interpretations of the 2011 Agreement as giving DRL the right to make and sell all-purple esomeprazole magnesium products using a virtually identical shade of purple on all or part of its capsules "runs counter to the agreement's overall

---

chain of custody) to a testing laboratory in England for analysis; and that the pills were never returned to outside counsel nor AZ's in-house counsel (*Id*. at 7).

scheme or plan" of resolving a patent dispute.

Moreover, courts "prefer[] a reading [of a contract provision] which avoids producing an absurd result or which no reasonable person would have accepted when entering the contract." *In re Westech Capital Corp.*, 2014 WL 2211612, at *16 (Del. Ch. May 29, 2014). DRL's interpretation of the 2011 Agreement, however, does just that. Specifically, DRL's interpretation produces the absurd result of AZ giving DRL the right to use AZ's famous Purple Marks, despite AZ still having ongoing trademark rights for as long as it uses those marks, to compete directly with AZ's Nexium® branded products. Moreover, there is no way that AZ (or any other "reasonable" trademark owner, let alone an owner of a famous trademark) would have accepted—as part of a resolution of a patent dispute—the idea of giving a direct competitor the right to use an incredibly famous and valuable trademark well known by the public.[2]

Finally, "[a] license to practice a patent . . . is not a license for a trademark or for copying trade dress, as a matter of law . . . ." *Biocraft Labs., Inc. v. Merck & Co.*, 532 F. Supp. 1068, 1078 (D.N.J. 1980). To discard this well-settled principle, as DRL suggests here, the 2011 Agreement would have needed to include express language to the contrary. Here, however, all of the hallmarks of a trademark license are absent from the 2011 Agreement (e.g., a schedule of the licensed trademarks, quality control provisions, etc.). In short, AZ and DRL are sophisticated parties and if they intended to enter into a trademark license they would have expressly drafted the 2011 Agreement to include the appropriate terms.

### B. AZ Did Not Release Any Trademark Claims under Section 3.1 of the 2011 Agreement

DRL argues that Section 3.1 of the 2011 Agreement released all of the trademark claims

[2] The fact that DRL chose to not use for its commercial product an all-purple pill in a single shade of purple very close to the shade of purple used by AZ for 20 years—despite allegedly having the legal right to do so under the 2011 Agreement—shows that DRL's contractual "defense" is an afterthought contrived solely for purposes of this case.

asserted by AZ in this action. In making this argument, DRL focuses only on the wording concerning broad concepts of "any and all claims" and "causes of action known or unknown, suspected or unsuspected," while ignoring critical parts of Section 3.1 that limit and qualify the cherry-picked wording quoted and relied on by DRL. Specifically, the claim language cited by DRL is all qualified by the following limiting language, which appears nowhere in DRL's analysis: ". . . that were asserted or that could have been asserted by AstraZeneca . . . in connection with the DRL Product, the Approved Nexium Product or the Actions *and arising before the Effective Date of this Settlement Agreement*" (emphasis added).

As an initial matter, AZ did not assert any trademark claims in the "Actions" so there were no "asserted" trademark claims for AZ to release. Moreover, regarding trademark claims that "could have been asserted," the italicized language above makes clear that the release of Section 3.1 applies only to such claims arising *before* the Effective Date of the 2011 Agreement, i.e., before January 18, 2011. Here, all of AZ's trademark claims arose after the Effective Date.

The district court in *New Colt Holding Corp. v. RJG Holdings of Florida, Inc.*, 312 F. Supp. 2d 195, 231-32 (D. Conn. 2004), rejected the same argument asserted here by DRL. Plaintiffs sent defendants a demand letter in early 2001 and filed suit in January 2002 regarding trade dress for guns. Defendants argued that plaintiffs' delay in bringing suit was unreasonable because: (1) representatives from the parties met twice in 1999, and defendants brought one of their guns to one of the meetings; (2) a defendant displayed a replica gun at a trade show in January 2000; and (3) in February/March 2000, defendants sent letters to plaintiffs advising them of their efforts to manufacture guns. *Id.* at 231. The court rejected defendants' argument that plaintiffs' failure to raise the issue of infringement during their prior meetings constituted a representation that plaintiffs would not assert a claim and that delay in filing suit constituted a

prejudice for purposes of acquiescence, holding that "Plaintiffs delay [was] not unduly prejudicial" because "Plaintiffs were not under any obligation to file suit or assert their rights until ripe. Plaintiffs' claims were certainly not ripe prior to Defendants' entry into the market . . . . " *Id.* at 232. Similarly here, AZ's trademark claims against DRL's purple esomeprazole magnesium pills did not become ripe until "[DRL's] entry into the market" a few weeks ago.

Moreover, the statutory language of the Lanham Act shown below makes clear that AZ's claims for trademark infringement and dilution did not arise until DRL *used* the infringing mark *in commerce*, *in connection with the sale, offering for sale, distribution, or advertising* of DRL's generic esomeprazole magnesium capsules, which DRL did not do until a few weeks ago.

- **Trademark Infringement, 15 U.S.C. § 1114(1)(a)**: Any person who shall, without the consent of the registrant—(a) *use in commerce* any reproduction, counterfeit, copy, or colorable imitation of a registered mark *in connection with the sale, offering for sale, distribution, or advertising of any goods* or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive (emphasis added)

- **Trademark Dilution, 15 U.S.C. § 1125(c)(1)**: Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, *commences use of a mark or trade name in commerce* that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury (emphasis added)

- **Definition of "Use in Commerce," 15 U.S.C. § 1127**: The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—(1) on goods when—
  (A) *it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto*, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, *and*
  (B) *the goods are sold or transported in commerce* (emphasis added)

### C. Section 9.13 Supports AZ's Position, Not DRL's Position

Not surprisingly, DRL gives short shrift to Section 9.13 of the 2011 Agreement—the

only section of the 2011 Agreement, that expressly deals with AZ's Purple Marks—which DRL cavalierly refers to as a "catchall" provision. Section 9.13 provides in pertinent part that "DRL shall have no right, title or interest in or to (a) any trademark, trade dress, brand mark, service mark, trade name, brand name, logo or other similar business symbol of AstraZeneca . . . including the trademark Nexium® or any trade dress of any Nexium® product . . . ." The 2011 Agreement thus explicitly makes clear that DRL has no right to *use* any of AZ's trademarks, including AZ's Purple Marks. To support its nonsensical interpretation of Section 9.3, DRL relies on an unduly narrow interpretation of the terms "right" and "interest" to AZ's trademarks in arguing that those terms means ownership, when in fact these broad terms encompass any rights or interests, including a license or other right or authorization to use trademarks. Indeed, AZ's interpretation is confirmed the patent license grant of the 2011 Agreement (Section 5.1) in which AZ grants to DRL a "*right* and license" under AZ's patents "to make, have made, *use*, sell, offer to sell, import, and distribute" the products at issue. (emphasis added)

Moreover, as this Court recently noted, when interpreting the entire agreement, "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *Phunware, Inc. v. Excelmind Grp. Ltd.*, 2015 WL 4606668, at *8, n.13 (D. Del. July 30, 2015) (quoting *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005)). Here, the specific language of Section 9.13, which makes clear that DRL acquired no right to use AZ's trademarks, controls and qualifies the general language relied on by DRL for its overly broad and illogical interpretation of the 2011 Agreement and AZ's covenants under that Agreement.

Section 6.2(c), AZ's covenant to not sue DRL, expressly states that AZ's covenant to not prevent DRL's manufacture or sales of generic esomeprazole magnesium is limited to such

activities only "as permitted under the terms of [the 2011 Agreement]." Because the use of AZ's Purple Marks is expressly prohibited by Section 9.13 of the 2011 Agreement as shown above, the covenants of Section 6.2(c) do not apply to DRL's use of AZ's trademarks.

Finally, to support its strained argument, DRL argues that Section 9.13 does not protect AZ's right to sue for trademark violations because the sentence precluding use of AZ's trademarks is preceded by the sentence "Except for the rights, agreements and covenants *specifically granted* pursuant to this Settlement Agreement, no other rights, agreements or covenants are granted or implied by this Settlement Agreement." (emphasis added) DRL's reliance on that sentence is misplaced because it actually supports AZ's position. Because the 2011 Agreement contains no covenants "specifically granted" by AZ that it would not forego enforcement of its *trademarks*, and because specific contract language controls over general language, Section 9.13 controls the present dispute and DRL's use of AZ's marks are "not permitted" under the 2011 Agreement and thus not subject to the covenants of Section 6.2(c).[3]

## III. DRL'S PAST USE OF A VERY DIFFERENT SHADE OF PURPLE FOR HALF OF ITS OMEPRAZOLE PILLS DOES NOT EXCUSE ITS USE OF AN ALL-PURPLE PILL FOR ITS ESOMEPRAZOLE MAGNESIUM PILLS

When DRL came out with its generic prescription version of the Prilosec® omeprazole compound, DRL notably did *not* use an all-purple pill. DRL notably also did *not* use a shade of purple identical or virtually identical to the shade of purple used by AZ for 20 years. Rather, DRL previously chose to use a shade of purple on half of the capsule that is distinctly different from the purple used on AZ's Prilosec® and Nexium® capsules, and either gray or yellow on the

[3] Section 6.2(c) of the 2011 Agreement also provides that the covenants not to sue do not apply in cases of "public policy or safety." Both the "public policy" and "public safety" exceptions of 6.2(c) are implicated in this case because one of the public policies of the Lanham Act is to keep the public free from confusion (D.I. 4 at 20) and there are obvious public safety issues with patient confusion in pharmaceutical trademark cases. (*Id.* at 18-19.)

other half of DRL's capsules (collectively, "DRL's Two-Colored Omeprazole Capsules").

DRL's recently-launched generic esomeprazole magnesium capsules at issue here are thus a material departure from DRL's Two-Colored Omeprazole Capsules. As shown below in the comparison photograph compiled by AZ (D.I. 1, ¶ 47 ), DRL's generic esomeprazole magnesium capsules use a shade of purple that is virtually identical to the purple that AZ has used for its Prilosec® and Nexium® products for 20 years.




DRL's own comparison photo of the parties' respective pills shown below, taken by DRL of pills DRL submitted with its Notice of Lodging (D.I. 15), similarly shows the material difference in the shades of purple used by DRL for DRL's Two-Colored Omeprazole Capsules and its esomeprazole magnesium capsules, as well as the virtually identical shade of purple used for DRL's esomeprazole magnesium pills and AZ's Purple Capsules:




DRL did not provide the Court with a physical example of AZ's Prilosec® purple capsule even



ME1 21412305v.1

though AZ has sold prescription Prilosec® in an all-purple capsule from 1989 to present.[4]

Accordingly, DRL's use of a distinctly different shade of purple for half of DRL's Two-Colored Omeprazole Capsules neither excuses nor constitutes a defense to its current use of an all-purple pill, half of which is virtually identical to the shade of purple used by AZ. As this Court noted in the related Camber case, Camber had "millions of choices" but chose "the same color of purple." (C.A. No. 15-0927-SLR, October 16, 2015 Hearing Tr. at 8-10.) So did DRL and it chose its colors at its own peril.

This is a classic case of "progressive encroachment." Under the doctrine of progressive encroachment, a plaintiff's claim is not precluded by laches, acquiescence, estoppel, or other equitable defenses when a third-party uses a trademark that moves materially closer to the plaintiff's mark than what the third-party had previously used. *See Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc.,* 511 F. Supp. 2d 482, 509 (E.D. Pa. 2007); *see generally* 6 McCarthy on Trademarks and Unfair Competition § 31:20 (4th ed.).[5] In *Urban Outfitters,* the court granted a preliminary injunction against defendant's use of the mark TRUE PEOPLE for apparel, finding a likelihood of confusion with plaintiff's FREE PEOPLE mark for the same goods. 511 F. Supp. 2d at 510. The court rejected defendant's argument that plaintiff's request for a preliminary injunction should be denied because of plaintiff's delay in bringing its motion based on defendant's use of TRUE PEOPLE for apparel for over five years. *Id.* at 509. The court instead held that defendant had progressively encroached on plaintiff's FREE PEOPLE mark because it had made material changes to its TRUE PEOPLE mark, including changing the font

[4] DRL also omits from its photo AZ's 20 mg version of its prescription Nexium® product and instead includes the 20 mg OTC version of Nexium®. DRL sells only prescription esomeprazole magnesium.

[5] Progressive encroachment similarly applies in other types of material change in the defendant's conduct, including expanding the use from *de minimis* use to widespread use, and expanding product offerings closer to the plaintiff's products. McCarthy, *supra*, § 31:20.

and color of the TRUE PEOPLE mark to create "a newly conceived" version of its mark that was closer to plaintiff's FREE PEOPLE mark. *Id.* Here, DRL likewise has created a "newly conceived" product; DRL materially changed its capsule color by using an all-purple pill and by using a purple shade virtually identical to the shade used by AZ for 20 years.

## IV. AZ'S TRADEMARK REGISTRATIONS BROADLY COVER ALL SHADES OF PURPLE

AZ's U.S. Trademark Reg. No. 2806099 broadly covers the color "purple" applied to GI pharmaceuticals, which covers both Prilosec® and Nexium® purple pills. DRL wrongly argues that AZ's three color trademark registrations claim "purple as a feature" but "that purple does not cover all purples." (D.I. 16 at 15.) AZ demonstrated in its Opening Brief that its three trademark registrations broadly encompassing the color covers all shades of that color. (D.I. 4 at 12-13.)

DRL half-heartedly argues that the absence of gold rings around DRL's capsules creates a distinct commercial impression from the "purple" marks in AZ's registrations. The absence of gold markings on DRL's capsules is irrelevant because: (1) AZ's Reg. No. 2806099 does not include any rings of any color (such as AZ's 20 mg prescription Prilosec®), and (2) the dominant portion of the marks shown in AZ's Reg. Nos. 2980749 and 3062072 is clearly the famous and widely-advertised purple color. Moreover, the U.S. Patent and Trademark Office confirmed that AZ's purple Nexium® pills, even with their gold rings, are clearly covered by AZ's Reg. No. 2806099 by accepting AZ's 2014 renewal application for that registration accompanied by pictures of its purple Nexium® 20 mg and 40 mg capsules as evidence of use of the registered mark for purple per se. (Mersing Decl., ¶¶ 3-4 and Exs. A-B.)

## V. CONCLUSION

For the reasons set forth above, AZ respectfully requests that the Court grant AZ's Motion for a Temporary Restraining Order.

Dated: November 2, 2015

MCCARTER & ENGLISH, LLP

/s/ Daniel M. Silver
Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
Benjamin A. Smyth (#5528)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com
bsmyth@mccarter.com

David M. Kelly (Of Counsel)
Robert D. Litowitz (Of Counsel)
Jane W. Wise (Of Counsel)
KELLY IP, L.L.P.
1919 M Street, NW, Suite 610
Washington, D.C. 20036
Telephone: (202) 808-3570

*Attorneys for Plaintiffs*